920 So.2d 89 (2006)
Daniel G. SIEGEL, individually, and Simon B. Siegel, individually, and as Trustee of trusts created under Articles Fifth and Sixth u/a Dorothy H. Rautbord, deceased, Appellants,
v.
Judith S. NOVAK, as Co-Personal Representative of the Estate of Dorothy H. Rautbord, deceased, and individually; and JP Morgan Trust Company, N.A., as Co-Personal Representative of the Estate of Dorothy H. Rautbord, deceased, Appellees.
Nos. 4D04-3435, 4D05-430.
District Court of Appeal of Florida, Fourth District.
January 18, 2006.
Rehearing Denied February 23, 2006.
*90 Richard A. Goetz and Glenn M. Mednick of Hodgson Russ LLP, Boca Raton, for appellants.
James G. Pressly, Jr., of Pressly & Pressly, P.A., West Palm Beach, for appellee Judith S. Novak.
Arnold L. Berman, Stephen T. Maher, William D. McEachern, and Vincent E. Miller of Shutts & Bowen LLP, West Palm Beach, for appellee JP Morgan Trust Company, N.A.
GROSS, J.
This consolidated appeal involves two aspects of decedent Dorothy H. Rautbord's estate plan: 1) Case No. 4D04-3435 involves *91 the petition to remove the co-personal representatives of Rautbord's estate, and 2) Case No. 4D05-430 concerns a challenge to disbursements made by the trustee of a revocable trust established by Rautbord. We hold that under New York law and the facts of this case, the decedent's sons have standing to challenge disbursements made by the trustee prior to Mrs. Rautbord's death. Therefore, we reverse the final judgment approving the accounting sought with respect to the trust. We affirm the trial court's dismissal of the attempt to remove the co-personal representatives of the estate.
Rautbord died on February 28, 2002. She was survived by three children: appellants Daniel and Simon Siegel and appellee Judith Novak.
On May 30, 1990, Rautbord executed a will that was subsequently amended by a second codicil dated July 11, 1990. The second codicil made her daughter, Judith, and appellee, JP Morgan Trust Company, co-personal representatives of her estate.[1]
Prior to the execution of her will, in March, 1990, Rautbord executed an Amended and Restated (Revocable) Agreement of Trust with JP Morgan Chase Bank as trustee. The trust directed that upon Mrs. Rautbord's death "[a]ll property which is directed to be disposed of pursuant to this Article shall be divided into and set aside in a sufficient number of equal shares to provide one (1) such share for each of the settlor's children [the Siegels and Novak], who survives the settlor, and one (1) such share for the issue of each of [the Siegels and Novak] who predeceases the settlor." A March, 1991 amendment to the trust described the disposition of trust property during Mrs. Rautbord's lifetime:
During the life of the Settlor [Mrs. Rautbord], the Trustee shall hold, manage, invest and reinvest the trust property, collect the income therefrom, and pay to or apply for the benefit of the Settlor, at any time or from time to time, so much or all of the net income and principal thereof as the Trustee, in its sole discretion, shall deem appropriate or advisable for the support, maintenance, health, comfort or general welfare of the Settlor. Any net income not so paid or applied shall be added to principal annually.
The trust was amended five times. Originally, the trust situs was Florida and the trust was to be construed under Florida law. A July 11, 1995 amendment provided that the trust was to be governed by the laws of the State of New York and gave the trustee the power to transfer the situs and assets of the trust to any other state, at the trustee's discretion. The trust also provided in pertinent part:
This Agreement shall be binding upon the personal representatives, successor, and assigns of the parties hereto. The settlor may from time to time, by duly acknowledged, written instrument delivered to the corporate Trustee during the Settlor's lifetime, amend, modify, or revoke, in whole or in part, this Agreement and any trust created hereunder; provided, however, that the foregoing powers of amendment, modification and revocation shall be personal to the Settlor and shall not vest in or be exercisable by any person or corporation acting in any fiduciary or like relationship to the Settlor (including, without limitation, the Settlor's attorney-in-fact, the Settlor's guardian (or like representative)), or any trustee in bankruptcy or receiver for the Settlor.... *92 Except as otherwise provided in this Agreement, this Agreement and all trusts created hereunder shall upon the Settlor's death become irrevocable and not subject to amendment, modification, or revocation thereafter.
(Emphasis added). JP Morgan Chase Bank transferred the assets and situs of the trust from New York back to Florida on March 6, 2003. Thus, during the time period at issue in the trust appeal, case number 4D05-430, the situs of the trust was New York pursuant to the July 11, 1995 amendment.
After creating the March, 1990 trust, Rautbord executed a durable power of attorney making her daughter, Judith Novak, her attorney-in-fact and giving her authority to, inter alia:
(13) make any gift, either outright or in trust, to any individual (including my Attorney-in-fact) or any charitable organization, provided that such gift either (i) shall be reasonably consistent with any pattern of my giving or with my estate plan or (ii) shall not exceed the annual exclusion available from time to time for federal gift tax purpose....
(18) [t]o create a revocable trust with such trustee or trustees (including my Attorney-in-Fact) as my Attorney-in-Fact may select which creates a trust requiring that (a) all income and principal shall be paid to me or any guardian (or like representative) for me or applied for my benefit in such amounts as I or my Attorney-in-Fact shall or as the trustee or trustees thereof shall determine, (b) on my death any remaining income shall be paid to my estate.
The document stated that the power of attorney did not include the authority "(6) [t]o amend, modify or revoke, in whole or in part, or withdraw any of the principal of, any trust over which I have reserved or have been granted such power [other than a trust created pursuant to the authority granted in paragraph 18 above.]"
While Rautbord was still alive, Novak made large withdrawals from the trust through the power of attorney, by signing a series of revocation letters. As trustee, JP Morgan Chase Bank approved all of these withdrawals.
In a 2001 letter, JP Morgan Chase Bank recognized that there may have been a problem with some of Novak's withdrawals, and that "Mrs. Rautbord [was] in her nineties [and] quite frail [.]" The letter went on to note that after "Mrs. Rautbord became incapacitated," Novak, through her power of attorney status, requested principal funds from the trust by signing a series of revocation letters. The Bank observed that the trust instrument "specifically stated" that revocation powers "be personal to the settlor and shall not be vested in or be exercisable by any persons... including, without limitation, the settlor's attorney-in-fact." The Bank concluded that the revocation letters "on file to support the principal distributions made during the period November 16, 1995 through June 26, 2001" were "questionable" for the purpose of authorizing principal distributions. The Bank indicated its intention to "ratify the principal distributions."
In March, 2003, JP Morgan Chase Bank filed a two count complaint seeking, inter alia, a "judicial accounting pursuant to Chapter 737, Florida Statutes," whereby the Bank sought a discharge from liability "for any and all Trustee actions during the period of Accounting." The Bank attached an 89-page accounting to the complaint. The complaint identified the brothers Siegel as defendants who were "interested persons and beneficiaries under the Trust."
*93 The Siegels filed an Answer and Affirmative Defenses. Their affirmative defenses complained that the accounting attached to the complaint did not "contain sufficient information detailing the various distributions" to allow them "to determine the propriety of such distributions." Also, they alleged that some distributions may not have been made for the purposes specified in the trustfor the "support, maintenance, health, comfort or general welfare of" Mrs. Rautbord.
In November, 2003, the trial court granted the Bank's motion for partial summary judgment. The court ruled that the Siegels had no standing to challenge any distributions made prior to their mother's death on February 28, 2002. The court reasoned that before Mrs. Rautbord's death, the trust was revocable, so that the brothers Siegel had "no present interest in the trust during the time that the decedent was alive." After the court entered a final judgment approving the accounting, the Siegels filed this appeal.[2]
The first issue we address is whether the Siegels' standing to object to the trust accounting should be decided under New York or Florida law. We agree with JP Morgan Chase Bank that New York law applies.[3]
"In a choice of law context, Florida maintains the traditional distinction between substantive and procedural matters." BDO Seidman, LLP v. British Car Auctions, Inc., 802 So.2d 366, 371 (Fla. 4th DCA 2001) (Gross, J., concurring) (citing Prestige Rent-A-Car, Inc. v. Advantage Car Rental & Sales, Inc., 656 So.2d 541, 544 n. 2 (Fla. 5th DCA 1995); Aerovias Nacionales De Colombia, S.A. v. Tellez, 596 So.2d 1193, 1195 (Fla. 3d DCA 1992); Guirlinger v. Goldome Realty Credit Corp., 593 So.2d 1135, 1136 n. 1 (Fla. 1st DCA 1992)). "As the forum state in this case, Florida law determines whether [the issue of standing] is substantive or procedural for choice of law purposes." See BDO Seidman, 802 So.2d at 371 (Gross, J., concurring) (citing Fahs v. Martin, 224 F.2d 387, 397, 401 n. 6 (5th Cir.1955); Smithco Eng'g, Inc. v. Int'l Fabricators, Inc., 775 P.2d 1011, 1017-18 (Wyo.1989)). Generally, when confronted by a choice of law problem, a court will apply foreign law when it deals with the substance of the case and will apply the forum's law to matters of procedure. See id. (citing SCOLES & HAY, CONFLICT OF LAWS § 3.8 (2d ed.1992) (footnotes omitted); see Colhoun v. Greyhound Lines, Inc., 265 So.2d 18, 20 (Fla.1972)). Substantive law generally relates to the rights and duties of a cause of action, while procedural law involves the "`machinery for carrying on the suit.'" BDO Seidman, 802 So.2d at *94 371 (quoting Smithco Eng'g, 775 P.2d at 1018) (internal citations omitted).
No Florida case has decided whether standing is a substantive or procedural matter for choice of law purposes. Recently, the eleventh circuit has indicated that "[u]nder Florida's choice of law provisions, Florida law governs all substantive issues, including the question of whether an individual has standing and capacity to sue." Gonzalez-Jiminez De Ruiz v. U.S., 378 F.3d 1229, 1230 n. 1 (11th Cir.2004). In Merkle v. Robinson, 737 So.2d 540, 542 (Fla.1999), the Florida Supreme Court held that "statute of limitation choice of law questions [should be treated] the same as `substantive' choice of law questions which,.... Florida decides pursuant to the `significant relationship' test."
In this area, the question of standing to assert a claim is analogous to a statute of limitations defense. Both issues relate to whether a cause of action may proceed; neither involves the "machinery for carrying on the suit" once the right to proceed has been determined. The ability to bring an action at law is a "most valuable attribute" of a legal right, a factor favoring the classification of standing as a substantive matter. See Merkle, 737 So.2d at 542-43 (citing Bates v. Cook, Inc., 509 So.2d 1112, 1114 (Fla.1987)) (quoting Comment, The Statute of Limitations and the Conflict of Laws, 28 Yale L.J. 492, 496 (1919)).
Here, the right of the brothers to challenge the distributions from the trust should be decided under New York law. For the challenged distributions, New York bears the most significant relationship to the trust. From 1995 to February 28, 2002, the trust was a New York trust governed by New York law. Florida's most recent connection to the trust commenced in 2003, when JP Morgan Chase Bank filed an intent to transfer the trust situs and assets back to Florida.
To argue that the brothers Siegel lack standing to object to any pre-death distribution, the Bank relies primarily upon In re Malasky, 290 A.D.2d 631, 736 N.Y.S.2d 151 (2002), and Application of Cent. Hanover Bank & Trust Co. (Momand), 176 Misc. 183, 26 N.Y.S.2d 924 (N.Y.Sup.Ct.1941), aff'd, 263 A.D. 801, 32 N.Y.S.2d 128 (1941), aff'd, 288 N.Y. 608, 42 N.E.2d 610 (1942). On their facts, both cases are distinguishable from this case.
In Malasky, a husband and wife created a revocable trust. 736 N.Y.S.2d at 152. The husband and wife were also trustees of the trust. Id. The husband died on November 3, 1995. A third party "succeeded him as cotrustee." Id. The wife petitioned the court "seeking a judicial settlement of three accounting [periods]." Id. The first accounting period involved the administration of the trust "from its inception to the date of" the husband's death. Id. The husband's children from a prior marriage filed objections to these accounting periods. Id.
The appellate court held that the children lacked standing to object to the accounting for the first accounting period, which ended with their father's death. Id. at 632, 736 N.Y.S.2d 151. The court observed that the husband and wife, as both the settlors and trustees of the trust, "received the income from the trust and explicitly retained the power to revoke or amend the trust at any time." Id. Prior to their father's death, the children had no right to receive anything from the trust. Without any pecuniary interest in the trust, they lacked "standing to object to the account for the first accounting period," which ended with their father's death. Id.
*95 Crucial to Malasky is the fact that the settlors of the trust were also its trustees. The central characteristic of a revocable trust is that the settlor "has the right to recall or end the trust at any time, and thereby regain absolute ownership of the trust property." Fla. Nat'l Bank of Palm Beach County v. Genova, 460 So.2d 895, 897 (Fla.1984). In this way, a revocable trust is similar to a Totten trust, a bank "account which the depositor holds `in trust for' or `as trustee for' another person, the beneficiary." Eredics v. Chase Manhattan Bank, N.A., 100 N.Y.2d 106, 760 N.Y.S.2d 737, 790 N.E.2d 1166, 1167 (2003). A Totten trust "may be revoked during the lifetime of the depositor by withdrawal of the funds." Id.; Hessen v. McKinley, 155 A.D. 496, 140 N.Y.S. 724, 726 (1913). A depositor's withdrawal of funds from an account is a "decisive and conclusive act of disaffirmance" so that a beneficiary may not later bring an action for an accounting seeking to recover the withdrawn funds. Hessen, 140 N.Y.S. at 726.
Like a depositor's withdrawal of funds from a Totten trust bank account, a settlor/trustee's withdrawal of funds from a revocable trust is tantamount to a revocation or termination of the trust with respect to the funds withdrawn. It is in this context that Malasky held that a prospective trust beneficiary has no standing to object to such a disposition of the property; the settlor retained the right to remove the property from the trust for any purpose and for any reason. In this situation, the settlor is, in essence, disposing of the settlor's own property. By making an expenditure from the trust, the settlor/trustee tacitly terminates the trust with respect to the expended funds.
A different situation arose in this case, where the settlor was not the trustee. When a person or entity different from the settlor removes property or money from a revocable trust, those withdrawals could conceivably be made without the settlor's knowledge or consent. In this situation, we hold that, under New York law, after the death of the settlor, the beneficiaries of a revocable trust have standing to challenge pre-death withdrawals from the trust which are outside of the purposes authorized by the trust and which were not approved or ratified by the settlor personally or through a method contemplated through the trust instrument. By outside the purposes of the trust we mean any expenditures that were not "appropriate or advisable for the support, maintenance, health, comfort or general welfare of" Mrs. Rautbord.
This holding is consistent with a broad view of standing which requires the showing of "an injury in factan actual legal stake in the matter being adjudicated[which] ensures that the party seeking review has some concrete interest in prosecuting the action which casts the dispute `in a form traditionally capable of judicial resolution.'" Soc'y of the Plastics Indus., Inc. v. County of Suffolk, 77 N.Y.2d 761, 570 N.Y.S.2d 778, 573 N.E.2d 1034, 1040 (1991) (quoting Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)).
In the context of probate proceedings, New York courts have held that persons have standing to participate in the proceedings even with property interests as tentative as those of the brothers Siegel. Thus, in In re Epstein, 277 A.D.2d 452, 715 N.Y.S.2d 904 (2000), the court held that a contingent remainderman with an interest subject to a condition precedent had standing to object to the accountings filed by an executor and trustee. The court in Estate of Morse, 177 Misc.2d 43, 676 N.Y.S.2d 407, 409 (N.Y.Sur.1998), described the *96 broad reach of New York's concept of standing:
In that light, it has been noted that "anyone who would be deprived of property in the broad sense of the word ... is authorized to appear and be heard upon the subject" of whether a will that would thus affect him adversely should be admitted to probate (Matter of Davis, 182 N.Y. [468, 472, 75 N.E. 530 (N.Y.1905)]). Accordingly, standing to object to probate does not require an interest that is "absolute"; a contingent interest will be enough (see Matter of Silverman, 91 Misc.2d 125, 397 N.Y.S.2d 319). In other words, the uncertainty of an interest should not preclude its holder from seeking to protect it, i.e., she should have standing to object to a propounded instrument that makes the possibility of benefit even more remote or eliminates such possibility entirely.
The New York Surrogate's Court Procedure Act adopts a broad view of standing similar to the case law. A trustee who voluntarily requests judicial settlement of an account must notify all persons "entitled absolutely or contingently...." N.Y. SURR. CT. PROC. ACT LAW § 2210(9) (McKinney 2005). In addition, section 2205(2)(b) of the Act provides that a court may compel the accounting of a fiduciary after the petition of "a person interested." Section 103(39) defines a "person interested" as "any person entitled or allegedly entitled to share as beneficiary in the estate...." "Estate" is broadly construed to include "[a]ll of the property of a decedent, trust, absentee, internee or person for whom a guardian has been appointed as originally constituted, and as it from time to time exists during administration." N.Y. SURR. CT. PROC. ACT LAW § 103(19) (McKinney 2005).
We also distinguish Momand. That case involved a settlor's creation of an inter vivos trust that set up a bank as the trustee. A provision of the trust provided "that the trustee shall be excused from accounting to any one but the grantor for acts of the trustee performed during [the grantor's] lifetime." 26 N.Y.S.2d at 927. The court enforced the explicit language of the trust and held that certain remaindermen had no right to "call upon the trustee for an accounting" for acts the trustee performed during the settlor's lifetime. Id. The revocable trust in this case contains no language that so limited the class of persons who could subject the trustee to an accounting.
According to Novak and the Bank, the Siegels may not address their concerns in either the trust accounting or the probate proceeding. This result is contrary to our sense of justicea trustee should not be able to violate its fiduciary duty and authorize withdrawals contrary to the provisions of the trust, and yet escape responsibility because the settlor did not discover the transgressions during her lifetime.[4] With an interest in the corpus of the trust after the death of their mother, the Siegels have standing to challenge the disbursements; they have alleged a concrete and immediate injury, caused by Novak and the Bank, which could be redressed by the circuit court. Without this remedy, wrongdoing concealed from a settlor during her lifetime would be rewarded. One "should not be permitted to escape the duty to account for property which ... [a] decedent put into [one's] possession and over which [one] exercised control both before and after the decedent's death." La Vaud v. Reilly, 295 N.Y. 280, 67 N.E.2d 242, 244 (1946).
*97 Affirmed in part, reversed in part, and remanded.
POLEN and MAY, JJ., concur.
NOTES
[1] The second codicil actually appointed Chemical Bank FSB as personal representative. After bank mergers, this entity has evolved into JP Morgan Trust Company.
[2] On June 14, 2004, after the entry of the final judgment against them in the trust case, the Siegels filed an amended petition to remove the personal representatives, appoint a successor personal representative, surcharge the personal representatives and determine compensation of the personal representatives. The Siegels contended that Novak and JP Morgan Trust should be removed as co-personal representatives because some of the $3,373,629 that JP Morgan Chase Bank allowed Novak to divert during Mrs. Rautbord's lifetime was in violation of the Rautbord Trust. The Siegels further asserted that neither of the co-personal representatives had attempted to reclaim the money for the trust and should be removed based on this failure to act. The trial court dismissed the petition on August 6, 2004. The court accepted the trustee's argument that the co-personal representatives of the estate did not have the duty to attempt recovery of assets of the trust "that could never be assets of the Rautbord Estate." We affirm that order without further comment.
[3] In the circuit court and in oral argument, both sides agreed that New York law applied to decide the issue of standing.
[4] We do not reach the issue of whether there has been any breach of fiduciary duty in this case, which concerns only the standing to raise the issue.